## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC, | No. 4:17-CV-00737 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PERMANENT EASEMENTS FOR 3.16 ACRES, TEMPORARY EASEMENTS FOR 3.86 ACRES, AND TEMPORARY ACCESS EASEMENTS FOR LESS THAN 0.01 ACRES IN DALLAS TOWNSHIP, LUZERNE COUNTY, PENNSYLVANIA, TAX PARCEL NUMBER 10-C7-00A-037-000, DALE A. WILKIE, et al., | |
| Defendants. | |

## MEMORANDUM OPINION

### MAY 30, 2023

## I.     INTROUCTION AND BACKGROUND

In 2017, Plaintiff-Condemnor Transcontinental Gas Pipe Line Company, LLC

("Transco") condemned portions of lands owned by Defendant-Condemnee Dale A.

Wilkie in Dallas Township, Luzerne County, Pennsylvania.[1] Transco obtained the

power of eminent domain from the Federal Energy Regulatory Commission

---

[1]     *See* Aug. 3, 2023 Order.

("FERC") by virtue of the Natural Gas Act, ("NGA") 15 U.S.C. § 771 *et seq.* Using its authority, it condemned a portion of the tract where Wilkie lives (the "Property") and obtained various easements (the "Rights of Way") to install and maintain an underground natural gas pipeline.[2]

The parties have agreed to a bench trial on the issue of just compensation.[3] In preparation for that trial, Wilkie retained Don Paul Shearer, a licensed real estate appraiser to evaluate the Property before and after the taking.[4] Shearer prepared an expert report (the "Report") explaining his analysis and consequent opinion on the diminution of the Property's value.[5] Part of that Report discussed the replacement value for a barn that was demolished during Transco's efforts to install the pipeline.[6]

In response to the Report, Transco moved for partial summary judgment, arguing that Wilkie could not recover the replacement value of the barn.[7] This Court granted Transco's motion but allowed Wilkie to submit an updated report reflecting the "barn's pre-demolition contribution to the [P]roperty's value."[8] Shearer subsequently prepared a supplemental report (the "Addendum").[9]

---

[2]   *Id.*
[3]   *See* March 24, 2023 Scheduling Order, Doc. 81; March 23, 2023 Order Granting Motion to Withdraw Jury Demand, Doc. 80.
[4]   *See* Shearer Curriculum Vitae, Doc. 88-2 at 91-100.
[5]   *See generally* Shearer Report, Doc. 88-2.
[6]   *See id.* at 32-46, 86.
[7]   Transco MpSJ, Doc. 69.
[8]   *See* March 22, 2023 Mem. Op. and Order, Doc. 76.
[9]   *See* Shearer Addendum, Doc. 92-4.

Before the Court are five motions *in limine* filed by Transco seeking to exclude certain items of evidence. All motions have been fully briefed and are ripe for disposition.

## II.   LAW

### A.   Motions *in Limine*

Motions *in limine* are " designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."[10] A court may decide the motion before trial or defer, deciding the issue during trial.[11] The movant seeking to admit evidence carries the burden of proof to meet the threshold of admissibility under the relevant rule or principle.

### B.   Rule 702 and the *Daubert* Standard

Under Rule 702—which is equally applicable to bench trials—"a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable."[12] As gatekeeper, trial judges have three duties: (1) "confirm the witness is a qualified expert"; (2) "check [that] the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized

---

[10]   *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).
[11]   *See United States v. Adams*, 36 F.4th 137, 150 (3d Cir. 2022).
[12]   *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008)).

knowledge"; and (3) "ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact."[13] "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'"[14]

Here, only the reliability of Shearer's opinion is at issue. "Rule 702's reliability threshold requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'"[15] "Courts look for rigor, not mere 'haphazard, intuitive inquiry.'"[16] An expert need not have the best foundation for their opinion—but they must have "good grounds" for it.[17] Speculative and subjective testimony will generally not derive from "methods which have been established to be reliable."[18]

## III.   ANALYSIS

Transco's five motions *in limine* seek to do the following:

1. Exclude any evidence relating to the hypothetical development of the Property into a residential subdivision ("Speculative Development Motion").[19]

2. Exclude any evidence relating to damages for the loss of trees, topsoil, and stone walls, damages for construction activities allegedly

---

[13]   *Id.* (quoting *Daubert*, 509 U.S. at 591).

[14]   *Id.* (citing Fed. R. Evid. 702).

[15]   *Id.* (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)).

[16]   *Id.* (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000)).

[17]   *Id.* (quoting *Karlo*, 89 F.3d at 81).

[18]   *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)

[19]   Speculative Development MIL, Doc. 90.

performed outside the Rights of Way, damages to a stone driveway and crop field, and damages for the costs to seal and/or test a well, plant trees outside the Rights of Way, store barn contents, and construct a wooden fence ("Noncompensable Damages Motion").[20]

3.  Exclude any evidence of the professional fees Wilkie incurred as a result of the Property's condemnation ("Professional Fees Motion").[21]

4.  Exclude any evidence relating to the value of the now-demolished barn on the Property and associated structures on the Property ("Barn Value Motion").[22]

5.  Exclude Shearer from testifying as an expert witness ("*Daubert* Motion").[23]

The Court turns to each motion in turn. For the following reasons, the Court grants in part Transco's Speculative Development, Barn Value, and *Daubert* Motions and grants its Noncompensable Damages and Professional Fees Motions in full.

### C.   Speculative Development

In its Speculative Development Motion, Transco moves to exclude any testimony relating to the hypothetical development of residential lots from portions of the Property (the "Excess Land") along Lake Street, a public highway. Transco

---

[20]  Noncompensable Damages MIL, Doc. 84.
[21]  Professional Fees MIL, Doc. 86.
[22]  Barn Value MIL, Doc. 82.
[23]  Shearer *Daubert* Mot., Doc. 88. Transco styles its motion to exclude Shearer as a motion *in limine*, but it seeks to exclude Shearer because he fails to meet the standards for expert testimony set forth in Federal Rule of Evidence 702. Therefore, the Court will interpret the motion as a *Daubert* motion.

argues that Shearer's opinion regarding the development of the Excess Land is speculative and relies and therefore inadmissible under Rule 702 and *Daubert*.[24]

The Court interprets Shearer's analysis on the value of the Excess Land as having two steps. First, he determined that the Excess Land is amenable to a residential subdivision. Second, he values the Excess Land by comparing it to sales of comparable tracts of vacant, but developable, land.[25] Using the prior sales as comparators, he determined the value of the fifteen acres of Excess Land to be $157,000 at a rate of $10,500 per acre.[26] Because Transco's easement prevented any structures on the Excess Land, Shearer concluded that Wilkie lost the entire value of the Excess Land through the taking.[27]

To determine whether the prospect of development should be a factor in the value of undeveloped land, "courts have generally approached the valuation of potential subdivision use in relation to the condition of the land at the time of the taking."[28] Therefore, the initial inquiry concerns "the adaptability of a particular piece of land for subdivision purposes."[29] Without some "improvements or

---

[24] Speculative Development MIL Br., Doc. 91 at 7.

[25] Shearer Report, Doc. 88-2 at 62-66.

[26] *Id.* at 66.

[27] Shearer Dep., Doc. 69-6 at 54:6-17 ("Q. Okay. So, you don't believe there's any value left in the area that could have been subdivided, prior to the taking? A. You could walk on it. Can't build on it. Can't develop it, by restrictions placed by Transco. So, does it have any value? I considered that it's still there. It provides some—well, it doesn't even provide buffer anymore because [Transco] took the trees. . . . So, it has little, if any, value as land, in my opinion.").

[28] 4 NICHOLS ON EMINENT DOMAIN § 12B.14.

[29] *Id.* (citing *inter alia Rothman v. Commonwealth*, 178 A.2d 605, 606 (Pa. 1962)).

preparation for subdivision," land "may not be valued as if the land were in fact a subdivision."[30] But if there is a sufficient likelihood that the property can and will be developed into a residential subdivision, the Court may consider that opportunity in valuing the property, "but only to the extent that the prospect of demand for such use would have affected the price a willing buyer would have offered for the property just prior to the taking."[31]

Shearer opines that the "highest and best" use of the Excess Land before the taking was "for continued use as improved with the subject dwelling, barn, and silo along with the potential to sell [ten] building lots along Lake Street" because of the Excess Land's "substantial frontage" along Lake Street.[32] Shearer's review of the applicable zoning laws indicates that the Excess Land is zoned for residential use.[33]

But Shearer didn't prepare or review a subdivision plan.[34] He also never reviewed a survey of the Excess Land and has no engineering background—both of

---

[30]  *Id.* (citing *inter alia Earl M. Kerstetter v. Commonwealth*, 171 A.2d 163, 164-65 (Pa. 1961)).

[31]  *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir. 1969) (citing *Southern Amusement Company v. United States*, 265 F.2d 34 (5th Cir. 1959); *Meadow Brook Club*, 259 F.2d at 45).

[32]  Shearer Report, Doc. 88-2 at 52.

[33]  *Id.* at 47-50.

[34]  *Id.* ("As of the date of taking herein, no subdivision plans for any lots had ever been drawn and/or presented to Dallas Township for approval."); *see also* Shearer Dep., Doc. 69-6 at 96:14-25 ("Q. And again, there have never been any subdivision plans developed or shared with you, as you develop this report. Correct? A. That is correct. Q. Okay. A. There are none, to my knowledge.").

which he agreed were necessary to develop a "formal [subdivision] plan."[35] Although Shearer admitted he was not qualified to develop a subdivision plan he also opined that "[t]here was no need to."[36] But he fails to explain why a subdivision plan was unnecessary.

Even if unnecessary, at minimum, a subdivision plan would be helpful to determining the feasibility of developing the Excess Land.[37] No plan was created or

---

[35] *Id.* at 65:13-17, 78:7-13 ("Q. Do you have a drawing of where these 15 acres are located? A. I would pray for all of the natural gas pipe line companies to do their diligence and provide that. But in absence of that, no. We have no way of knowing."), 79:5-10 ("Q. We didn't provide you with a survey of the entire property. But, do you have a survey, a drawing, anything, that shows the location of these 15 acres within the 73 acres of the property? A. I've already testified, no."). At Shearer' deposition, he expressed that "[i]t would be nice if we appraisers would have a survey, spot survey, showing where all buildings are and showing where the pipe line is." *Id.* at 62:24-63:2. But Shearer didn't have a survey when he prepared his Report, and doesn't recall being provided with one. *Id.* at 63:2-4.

[36] *Id.* at 61:24-62:4.

[37] In circumstances where there's a more realistic prospect of development, courts employ the "lot method," which accounts for things like the cost of development, marketing, and the time it takes to sell off the lots. *See United States v. An Easement & Right-of-way Over 6.09 Acres of Land, More or Less*, 140 F. Supp. 3d 1218, 1247 & n.7 (N.D. Ala. 2015); *see United States v. 147.47 Acres of Land*, 352 F. Supp. 1055, 1059-60 (M.D. Pa. 1972) (Nealon, J.). Shearer doesn't appear to have applied the lot method. *See* Shearer Dep., Doc. 69-6 at 69:7-24 ("I merely put in the potential [number of] lots because that was supportive data that made sense[,] [b]ut he never specified whether [the Excess Land] would be sold as [fifteen acres], three [five-acre] lots, or a potential for ten building lots."), 86:23-87:3 ("Q. Okay. So if you were treating it as excess land, where is the analysis of absorption rates, demand, marketing times, for this excess land? A. Well, there is none because I didn't appraise that acreage separately."). But it offers a useful framework. One of the most important steps in the lot method is to prepare a subdivision plan. *See* 4 NICHOLS ON EMINENT DOMAIN § 12B.14. Other preparatory steps a landowner could take include "the filing of a plat, or some actual alteration of the land." *See id.* Here, Shearer did not have any evidence that Wilkie had taken similar steps, which substantially cuts against his valuation of the Excess Land's development potential. *See id.*; *United States v. 99.66 Acres of Land*, 970 F.2d 651, 656 (9th Cir. 1992) (affirming district court's rejection of lot method even where "some engineering plans had been drawn, some drainage work begun on other portions of the land, and a contract entered into with a utility provider").

submitted—much less presented to or approved by Dallas Township. Nor was Shearer provided one by Wilkie.[38] Shearer did contact a Dallas Township "zoning officer" and discussed the "subdivision of lots along Lake Street, . . . confirmed the zoning [of the Property]," and "[r]estrictions [and] limitations to the use of the [P]roperty."[39] But he doesn't know whether the zoning officer had an engineering background.[40] Regardless, Shearer didn't obtain an official opinion on the feasibility of developing ten one-acre lots from the zoning officer.[41] Shearer's informal conversation with Dallas Township's zoning officer is not a reliable basis for this Court to conclude that the Township would have approved a subdivision on the Excess Land.

Instead, Shearer asserted himself as qualified to offer an "informal" subdivision plan, using his own measurements he took when he visited the Property.[42] In creating that informal plan, he "guestimate[d] where the pipeline is."[43] An expert opinion cannot be based on "guestimates"—even in part. It also does not

---

[38]   Shearer Report, Doc. 88-2 at 63.

[39]   Shearer Dep., Doc. 69-6 at 52:14-16.

[40]   *Id.* at 65:23-66:14

[41]   *See id.* at 60:22-62:4.

[42]   *Id.* at 65:2-22, 79:12-24 ("A. I have to say again, it's just from my walking and measuring. Q. Did you put stakes out when you were measuring where these 15 acres were located? A. Of course not. I had no metes and bounds to do that. I said I did rough measurements, running from the road back, again, to ascertain . . . how far back we had to go from the road, where the watercourse, as defined in the zoning, was located. Was there enough area to build one or more houses? That was my only concern.").

[43]   *Id.*

appear that Shearer ever reduced his informal plan to a drawing or any other pictorial form that was made available to the Court.

Shearer also assumes that the proposed lots would have sewer functionality based on his review of Dallas Township's "a robust alternative sewer plan" and his unspecified discussion with the municipal zoning officer.[44] But he's not a sewer engineer and isn't qualified to opine on the feasibility of a potential alternative sewer system.[45] He recalls asking Wilkie if he ever had the ground tested for its amenability to a septic tank and believes Wilkie had the land tested, "but not for the specific purpose of building lots."[46] He therefore has no basis to opine on the feasibility of a sewer system on the Excess Land.

Perhaps in acknowledgement of the dearth of support for this potential subdivision plan, Wilkie argues that he will testify that "he [took] steps to investigate subdividing his property."[47] But it doesn't appear that Shearer knew about these steps or relied on them.[48] Shearer can't rely on Wilkie's unexpressed intentions to subdivide the property to form his opinion as to the feasibility of developing the

---

[44]   *Id.* at 68:12-69:3.
[45]   *Id.* at 69:4-6.
[46]   *Id.* at 67:5-15.
[47]   Speculative Development MIL Opp., Doc. 96 at 16.
[48]   *See id.* at 66:15-19 ("To get to the point of your question, no. I did not talk to an engineer or anybody about a subdivision plan because there is none. And I don't know that Doctor Wilkie ever did. But I don't know that he didn't."), 69:25-70:3 ("*Wilkie never told me he had any desire to do this*, but he could have developed whatever number of lots without doing anything." (emphasis added)).

Excess Land. Wilkie also argues that Transco's rebuttal expert also concluded that residential development was possible.[49] But Shearer obviously could not have relied on the rebuttal report—it was created in response to his Report. Wilkie last argues that these issues are matters of weight rather than admissibility—the same argument he offers in response to all of Transco's attacks on Shearer's methodology and qualifications.[50] The Court disagrees. Whether the land is developable is certainly an important factor in determining its value at trial. But whether Shearer is qualified to opine as to the land's developability is a threshold issue.

In sum, Shearer has no evidence to show that approval of a subdivision plan was reasonably likely.[51] His analysis rests on several unfounded assumptions—most of which Shearer has no basis for and/or is admittedly unqualified to make. Shearer also appears to be aware of steps he could have taken to support his analysis—like obtaining a survey—but admits he did not take those steps. Shearer may be correct that ten lots could be developed—but his expert opinion to that effect is not based on the application of reliable principles to sufficient facts and is accordingly

---

[49] Speculative Development MIL Opp., Doc. 96 at 16.

[50] *See* Speculative Development MIL Opp., Doc. 96 at 9-14.

[51] *See Fuller*, 862 A.2d at 163 ("Here, not only was approval to subdivide foreseeable, but testimony established it was probable since the plan submitted and used for valuation complied with all applicable zoning ordinances.").

inadmissible. Therefore, Shearer may not testify at trial to the hypothetical development of the Excess Land.[52]

### D.    Noncompensable Damages

In its Noncompensable Damages Motion, Transco seeks to exclude any evidence relating to "damages for the loss of trees, topsoil, and stone walls, damages for construction activities allegedly performed outside the Rights of Way, damages to a stone driveway and crop field, and damages for the costs to seal and/or test a well, plant trees outside the scope of the Rights of Way, store barn contents and construct a wooden fence."[53] Transco argues that: (1) just compensation under the Pennsylvania Eminent Domain Code does not include the above damages, (2) Shearer cannot testify to most of those damages because he did not consider them in his Report, and (3) Wilkie's claims for said damages are "impermissible counterclaims."[54]

With respect to Transco's first argument, the Court begins with the settled principle that relevant evidence is evidence that makes a fact in dispute more or less likely to be true.[55] Irrelevant evidence is inadmissible.[56] The only dispute in this

---

[52]   The Court's ruling is limited only to Shearer's opinion on the developability and potential development of the Excess Land. Shearer may attempt to present additional evidence relating to development of the Excess Land subject to Transco's objections at trial.

[53]   Noncompensable Damages MIL Br., Doc. 85 at 1.

[54]   *Id.* at 4.

[55]   *See* Fed. R. Evid. 401.

[56]   *See* Fed. R. Evid. 402

proceeding is just compensation—which is the difference in fair market value of the Property before and after the partial taking of the Property. In *Tennessee Gas Pipeline Co., LLC v. Permanent Easement for 7.053 Acres*, the United States Court of Appeals for the Third Circuit held that federal courts should use state substantive law to determine just compensation in condemnation actions brought under the NGA—like the one at issue here.[57] Therefore, Pennsylvania substantive law determines what factors the Court can consider in determining fair market value, and by extension what evidence is relevant. Put differently, evidence of damages that are not recoverable under the Eminent Domain Code is irrelevant in condemnation actions brought under the NGA.

Transco argues that the Eminent Domain Code does not allow condemnees to recover the damages Wilkie purports to seek. It directs the Court's attention to section 714 of the Eminent Domain Code, which provides that "[a]ll condemnors, including the Commonwealth, shall be liable for damages to property abutting the area of an improvement resulting from change of grade of a road or highway, permanent interference with access or injury to surface support, whether or not any property is taken."[58]

---

[57]   931 F.3d 237, 241 (3d Cir. 2019), *as amended* (July 25, 2019).
[58]   26 Pa. C.S. § 714.

13

As Transco notes, Pennsylvania courts have interpreted section 714 narrowly.[59] In *In re Commonwealth, Department of Transportation*, the Commonwealth Court of Pennsylvania rejected a landowner's attempt to recover damages resulting from the removal of walls, fencing, a gate, damage to asphalt, and other like damages because such damages "are not compensable under either [s]ection 702, [which defines just compensation,] or [s]ection 714."[60] As noted above, it appears that Wilkie seeks to recover similar damages. He may raise those damages in an independent tort action, but they are not properly considered in this condemnation action under sections 702 and 714.

However, consequential damages incurred by the condemnee's use of the land may be recoverable if they affect the after-taking value of the condemned property.[61] Transco recognizes that principle but its second argument is that Shearer cannot testify to those damages because he did not "consider the impact" of the walls,

---

[59] *See In re Com., Dep't of Transp.*, 137 A.3d 666, 672 (Pa. Commw. Ct. 2016) ("Construing identical language under the former code provision relating to consequential damages, this Court held recovery of such damages is permitted 'as a result of only three causes: (1) change of grade of a road or highway; (2) permanent interference with access to a road or highway; and [,] (3) injury to surface support.'" (quoting *Daw v. Com., Dep't of Transp.*, 768 A.2d 1207, 1210 (Pa. Commw. Ct. 2001))).

[60] *Id.* at 668, 672.

[61] *See Middletown Twp. v. Baker*, 522 A.2d 1182, 1184 (Pa. Commw. Ct. 1987) ("In determining the after value of the property, [an evaluating] expert may consider the cost of the adjustments and alterations to any remaining property made necessary or reasonably required by the condemnation." (citing 26 P.S. § 1-705(2)(v), which was repealed and replaced with identical language in 26 Pa. C.S. § 1105(2)(v))).

14

driveway, or fences when determining the Property's value.[62] Wilkie responds—without citation—that "Shearer's Report specifically includes the loss of trees and damages to stone walls in his calculation of damages."[63]

Shearer references the outdoor stone walls as elements of the damages incurred through Transco's taking in his Report but does not appear to assign them any particular value or explain how they factor into his opinion on the Property's value before or after the taking.[64] However, his Report does not reference the fences, the stone driveway, or the well that was shut in. Accordingly, the Court will preclude him from testifying about the walls, fences, driveway, and the well. The admissibility of any additional evidence regarding the walls, fences, driveway, and the well are issues the Court will consider at trial, should they arise.

Shearer's Report does discuss the loss of the trees in the area subject to the Rights of Way. He opines that the loss of the trees represents a loss of five percent of the Property's before-taking value.[65] That five percent includes the "privacy, buffer, and aesthetic value of the trees" as well as the loss of "access across the before-taking lands" that Transco's easement prohibits.[66] But Shearer admits that his

---

[62]  Noncompensable Damages MIL Br., Doc. 85 at 9.
[63]  Noncompensable Damages MIL Opp., Doc. 93 at 17.
[64]  Shearer Report, Doc. 88-2 at 78 (placing the "[l]oss of trees . . . along with stone walls that were demolished and the stone taken from the property" under heading "Recapitulation of Elements of Damages to Subject Property by Taking and Natural Gas Pipeline").
[65]  *Id.* at 86.
[66]  *Id.*

choice of five percent is "subjective." He explained that "it seems reasonable that a [five percent] adjustment should be made for the loss of the privacy because the trees did create privacy, a buffer area to the house."[67] He described the loss of privacy to be "some subjective number that somebody will believe."[68]

The Court has already discussed Rule 702's requirement that expert opinions be based on reliable principles and methods above. Shearer admits that his methodology to evaluate the lost trees was entirely subjective. Therefore, the Court will exclude Shearer's opinion on the value of the trees.

Third, Transco argues that Wilkie's claims for damages caused by Transco's work are actions in the nature of trespass that the Court has no jurisdiction over in this condemnation proceeding.[69] Wilkie appears to agree.[70] Although a landowner facing a partial taking may recover "severance damages for the diminution in value of the remainder directly caused by the taking itself and by the use of the land taken," claims for severance damages "must be distinguished from claims for the 'actual physical invasion of the remainder resulting from the intended use of the land

---

[67]   Shearer Dep., Doc. 69-6 at 141:3-142:2.
[68]   *Id.* at 142:6-16.
[69]   Noncompensable Damages MIL Br., Doc. 86 at 11-12
[70]   Noncompensable Damages MIL Opp., Doc. 93 at 17 ("To the extent Transco is objecting to the inclusion of evidence related to negligent conduct, that evidence will be submitted in a separate tort action.").

taken.'"[71] Such claims are "in effect counterclaims for compensation in inverse condemnation."[72] The distinction between the two types of claims "is critical because the district court has no jurisdiction in a condemnation action to entertain counterclaims."[73]

Therefore, to the extent Wilkie argues that Transco's use of the Property exceeds the scope of the Rights of Way and caused damage to the Property, he must file a separate action. Evidence of such consequential damages is inadmissible in this proceeding unless it is used to determine the after-taking value of the Property.

## E.    Professional Fees

In its Professional Fees Motion, Transco seeks to exclude any evidence relating to professional fees Wilkie paid in the course of evaluating his property.[74] Transco raises two arguments as to why Wilkie cannot recover professional fees as damages in this action. First, Transco argues that the fees Wilkie seeks are not included as "just compensation" under Pennsylvania law.[75] Second, even if the fees are recoverable, Transco argues that the statute authorizing reimbursement of a condemnee's professional fees applies only to condemnation actions brought under

---

[71]   *United States v. 38.60 Acres of Land, More or Less*, 625 F.2d 196, 199 (8th Cir. 1980) (quoting *United States v. 101.88 Acres of Land*, 616 F.2d 762, 768 (5th Cir. 1980)).

[72]   *Id.*

[73]   *Id.*

[74]   Wilkie apparently seeks to recover attorneys' fees, fees for architectural work, and fees for other expert witnesses. *See* Wilkie Dep., Doc. 69-5 at 86:18-87:1.

[75]   Professional Fees MIL Br., Doc. 87 at 3-8.

Pennsylvania law, not actions brought under federal law like this one.[76] Wilkie largely does not respond to Transco's arguments, arguing that "he only seeks to recover the professional fees to which he is entitled under the Eminent Domain Code."[77]

Title 26 Pa. C.S. § 710—the statute at issue—provides that the owner of any property right affected by a condemnation action initiated by an "acquiring agency . . . shall be reimbursed in an amount not to exceed $4,000 per property . . . as a payment toward reasonable expenses actually incurred for appraisal, attorney and engineering fees." As expressed above, *Tennessee Gas* directs federal courts to apply Pennsylvania law when it comes to determining just compensation. But the procedure of condemnation actions is governed by Federal Rule of Civil Procedure 71.1—which does not allow condemnees to recover professional fees.[78]

Section 701 of the Pennsylvania Eminent Domain Code provides that "[a] condemnee shall be entitled to just compensation for the taking, injury or destruction of the condemnee's property, determined as set forth in this chapter" and "[o]ther damages shall also be paid or awarded as provided in this title." Section 702 defines

---

[76]  *Id.* at 6.
[77]  Professional Fees MIL Opp., Doc. 94 at 15.
[78]  *See Tennessee Gas*, 931 F.3d at 243 (explaining that language in the NGA that required federal courts to use state "practice and procedure" in condemnation actions "has been superseded by Rule 71.1, which establishes its own procedures applicable to all condemnation cases in federal court" (citing Fed. R. Civ. P. 71, Advisory Committee Notes (1951); *Alliance Pipeline LP v. 4.360 Acres of Land*, 746 F.3d 362, 367 (8th Cir. 2014))); Fed. R. Civ. P. 71.1.

just compensation as "the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected by the condemnation and the fair market value of the property interest remaining immediately after the condemnation and as affected by the condemnation." That definition is similar to the federal definition of just compensation.[79]

But fair market value under Pennsylvania law has a more "inclusive" definition than it does under federal law.[80] Section 703 defines "fair market value" as "the price which would be agreed to by a willing and informed seller and buyer, taking into consideration but not limited to the following factors": (1) "[t]he present use of the property and its value for that use"; (2) "[t]he highest and best reasonably available use of the property and its value for that use"; (3) "[t]he machinery, equipment and fixtures forming part of the real estate taken"; and (4) "[o]ther factors as to which evidence may be offered as provided by Chapter 11 (relating to evidence)." Section 1105(2) allows the admission of additional items of evidence a valuation expert may offer.

None of the cited sections provide that professional fees are part of the just compensation a condemnee is due. That makes sense—a capped fee award for a

---

[79]   *See id.*
[80]   *See id.*

ancillary services like an appraisal has nothing to do with the fair market value of a property. Nor are professional fees the "consequential damages" a condemnee is entitled to under section 714, which is a narrow provision, as noted above. Therefore, the Court concludes that the recovery of professional fees as damages under section 710 are "other damages" rather than a part of "just compensation" under section 701. Accordingly, the Court agrees with Transco that section 710 does not apply in this federal condemnation action.

As to Transco's second argument, an "acquiring agency" is "[a]ny entity, including the Commonwealth, vested with the power of eminent domain by the laws of this Commonwealth."[81] There is no dispute that Transco's authority to condemn land flows from the NGA, not Pennsylvania law.[82] Therefore, Transco isn't an "acquiring agency" under the Eminent Domain Code, and Wilkie cannot recover his professional fees from it.

### F.  Barn Value

In the Barn Value Motion, Transco next to exclude evidence relating to a hypothetical income stream from a proposed event-venue business housed in a barn on the Property. Transco argues that Shearer's inclusion of that income stream in his

---

[81]  26 Pa. C.S. § 503.

[82]  *See* Notice of Condemnation, Doc. 1-2; Decl. of David Sztroin, Doc. 5-6 ¶¶ 12-15; Federal Energy Regulatory Commission Order Issuing Certificate, Doc. 5-6 at 14-28 (attached as "Exhibit A" to the Sztroin Declaration).

opinion (1) goes beyond this Court's prior Order allowing Wilkie to submit an updated report on the barn's pre-demolition contributory value and (2) is speculative and accordingly inadmissible under Rule 702 and *Daubert*.[83] Transco also moves to exclude any evidence of the barn's replacement value.[84]

The Court's March 22, 2022 Memorandum Opinion and Order stated that Wilkie was limited to recovering the "difference between the fair market value of [his] entire property interest immediately before the condemnation . . . and the fair market value of the property interest remaining immediately after the condemnation"—not the value "of the fully restored barn that he claims to have been promised."[85] Accordingly, the Court allowed him "to submit an updated expert report that includes the barn's pre-demolition contribution to the property's value."[86] Therefore, the Court shall exclude any reference to the barn's replacement value.

In the Addendum Shearer prepared in response to the Court's Order, he explains that he "was unable to locate any sales of unique and historic barns[,] particular[ly] American Chestnut wood barns that were income-producing or were otherwise sold separately from an existing farm."[87] He therefore used the income

---

[83]   Barn Value MIL Br., Doc. 83 at 9-14.
[84]   *Id.* at 3. Shearer relied in part on two architectural reports from Lynn Kesselman and Summit Pointe Builders to determine the cost to reproduce or replace the barn.
[85]   Doc. 76 at 5.
[86]   *Id.*
[87]   Shearer Addendum, Doc. 92-4 at 4.

capitalization method to evaluate the barn's contributory value to the Property.[88] The income capitalization approach is a permissible method of valuing real property when there are no comparable sales—as Shearer contends is the case here.[89] The approach method "requires the future income stream to be discounted in order to obtain a 'present value' as of the date of taking."[90] Pennsylvania's Eminent Domain Code expressly authorizes valuation experts to apply the income capitalization approach.[91]

But "[c]apitalization of future income should not be used when the future use or demand for that use is speculative."[92] "The mere physical adaptability to a given use is insufficient to invoke the capitalization method, and the landowner must show that 'an income producing market existed at the date of the taking or will exist in the reasonably near future.'"[93]

---

[88]   *See id.* at 6. Shearer did not, however, develop an opinion as to the value of the American Chestnut wood used in the barn's structure because valuating the wood "as a marketable chattel . . . is beyond [his] expertise and knowledge." *Id.*

[89]   *United States v. 25.202 Acres of Land*, 860 F. Supp. 2d 165, 176-77 (N.D.N.Y. 2010) (citing *United States v. 47.14 Acres of Land*, 674 F.2d 722, 725-26 (8th Cir. 1982)).

[90]   *Foster v. United States*, 2 Cl. Ct. 426, 455 (1983).

[91]   *See* 26 Pa. C.S. § 1105(2)(iii) (providing that a valuation expert's testimony may consider "[t]he capitalization of the net rental or reasonable net rental value of the condemned property, including reasonable net rental values customarily determined by a percentage or other measurable portion of gross sales or gross income of a business which may reasonably be conducted on the premises.").

[92]   *Id.* (citing *United States v. 75.13 Acres of Land*, 693 F.2d 813, 816 (8th Cir. 1982)).

[93]   *25.02 Acres of Land*, 860 F. Supp. 2d at 177 (quoting *75.13 Acres of Land*, 693 F.2d at 816); *accord PBS Coals, Inc. v. Dep't of Transp.*, 244 A.3d 386, 399 (Pa. 2021) ("There are two requirements, and only two, for proving highest and best use. First, the condemnee must show the physical adaptability of the land to such a use, and second it must be demonstrated that this use is needed in the area. As a result, the 'highest and best use' inquiry includes consideration

Accordingly, "[a] potential future use of condemned property should not be considered as the present measure of value."[94] Put differently, "if there is no currently operating business, it would be 'improper to value the property as if it were actually being used for the more valuable purpose.'"[95] Instead, "[a] potential use should be considered only to the extent that the prospect of demand for such use would have affected the price that a willing buyer would have offered for the property just prior to the taking."[96] "This is especially the case where the creation of the potential use would require a substantial expenditure of capital."[97]

To determine the barn's income for the income capitalization approach, Shearer relied on a letter sent to Wilkie by the IREM Country Club at the Masonic Village in Dallas, Pennsylvania (the "Club").[98] In the letter, the Club's director expressed the Club's interest "in marketing [Wilkie's] barn and adjacent grounds for

---

of whether the proffered use is reasonably possible." (citing *Pennsylvania Gas & Water Co. v. Pennsylvania Tpk. Comm'n*, 236 A.2d 112, 116 (Pa. 1967))); *Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend on events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration . . . .").

[94] *25.02 Acres of Land*, 860 F. Supp. 2d at 177 (citing *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir. 1969)).

[95] *Id.* (quoting *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958)); *accord Foster v. United States*, 2 Cl. Ct. 426, 448 (1983) (commenting that the income capitalization approach "is of little value where the realization of an opportunity for income was not even begun as of the date of taking." (citing *United States v. 15.00 Acres of Land*, 468 F. Supp. 310, 314 (E.D. Ark. 1979))).

[96] *25.02 Acres of Land*, 860 F. Supp. 2d at 177 (citing *1,291.83 Acres of Land*, 411 F.2d at 1084).

[97] *1,291.83 Acres of Land*, 411 F.2d at 1084 (citing *United States v. 2,635.04 Acres of Land, etc.*, 336 F.2d 646 (6th Cir. 1964)).

[98] *See id.* at 6-9.

23

the use as a 'special event venue' for patrons of the [Club]," given that "barn style venue[s] [are] very popular with today's bridal couple[s]."[99] The letter noted that [the Club] "receive[s] numerous calls from bridal couples interested" in having wedding events "in local barns" and that Wilkie's barn was close enough to the Club's facilities to facilitate events.[100]

The Club "anticipate[d] . . . [that its] sales and event staff would market and sell the Chestnut Hill Barn and grounds for [ten] weekends . . . for an initial fee of $2,500 per weekend or up to a total of $25,000 for the 2018 season."[101] But "[t]he rate [was] open for discussion and depend[ed] on any work done on the property to improve the venue."[102] Still to be discussed were "maintenance of the grounds, parking, lighting, use of water[,] a location for potable outdoor bathroom facilities for the guests, . . . . liability insurance, [a] catering permit, and liquor distribution at events."[103]

Shearer used the letter's proposed fees for his income capitalization calculation.[104] But there was no event-venue business in the barn prior to the taking. Therefore, it's only appropriate to consider the potential business to the extent that

---

[99]    *Id.* at 7 (Aug. 1, 2017 Ltr. from Noah Davis, Irem Executive Director, to Wilkie).
[100]   *Id.*
[101]   *Id.*
[102]   *Id.*
[103]   *Id.*
[104]   *See* Shearer Addendum, Doc. 92-4 at 6.

a buyer would offer a higher sum to purchase the barn because it could be used as an event venue.[105] That would be consistent with the Court's March 22, 2022 Order because it would reflect barn's contribution to the Property's overall value

That's not what Shearer did. He instead evaluated the hypothetical event-venue business as if it existed on the day of the taking as a separate asset. But it didn't exist at the time of the taking. As the Club's letter indicates, Wilkie had just begun negotiations with the Club about *potentially* using the barn as a venue. Wilkie argues that he had already begun to prepare the barn to be an event venue because he already had plans to begin a venue business in the barn but admits that the event space was "a business opportunity that [he] had not taken advantage of yet."[106] Shearer acknowledges several steps Wilkie would have to take before starting the proposed business: finishing restoring the barn, obtaining permits for catering and alcohol distribution, and obtaining insurance. He has no basis to conclude that completing those steps was feasible or likely.

The Court finds this situation similar to one confronted by the Honorable Elsijane Trimble Roy of the United States District Court for the Eastern District of Arkansas in *United States v. 15.00 Acres of Land, More or Less, in Mississippi County, State of Arkansas*.[107] There, the condemnees "arrived at the fair market value

---

[105] *See 25.02 Acres of Land*, 860 F. Supp. 2d at 177.
[106] *See* Dep. of Dale Wilkie, Doc. 69-5 at 135:4-24.
[107] 468 F. Supp. 310 (E.D. Ark. 1979).

of the fifteen acre tract by capitalizing anticipated profits from the prospective rental of blinds to persons desiring to hunt ducks on the tract."[108] But the condemnees "had not yet built additional blinds and had not charged any person for duck hunting on the tract prior to the date of taking."[109] The condemnees' valuation of the tract was "based wholly on the loss of future profits, profits which, although completely unrealized at the time of taking, were to be derived through the utilization of the land for an anticipated business opportunity."[110] Judge Roy rejected that approach, concluding that the condemnees could not recover "the amount of future profits lost through the foreclosure of an anticipated or prospective business opportunity, especially where, as in the present case, those profits are purely speculative and conjectural."[111]

Wilkie is in the same situation. As was the case in *15.00 Acres*, Wilkie's proposed event-venue business is just that—proposed. Shearer simply assumes the business would have taken hold without a hitch. He doesn't have the qualifications or the basis to make that assumption. He has no experience in operating an event-venue business. He has no insurance or contractor's quotes to show that Wilkie could obtain insurance or finish restoring the barn. Accordingly, the Court

---

[108] *Id.* ay 314.
[109] *Id.*
[110] *Id.*
[111] *Id.* at 315.

26

concludes that the income-capitalization approach is not an appropriate method to evaluate the barn's contributory value to the Property.

But even putting aside that defect, Shearer's application of the income capitalization method is highly speculative and would still be inadmissible even if the income-capitalization approach was applicable to the barn. Although the Club "anticipated" a $2,500 fee for events, "[t]he rate [was] open for discussion" and therefore could have changed.[112] Shearer's "professional and qualified opinion" is that Wilkie could have held, "at a minimum, another [five] events at the same rates for the barn the first year and more in later years."[113] He offers no basis for that opinion. But using that figure, he calculated the barn's yearly income to be $37,500 as an event venue, "with the Club providing and paying for liability insurance for all events and general cleanup for all events."[114] But the Club's letter expressly acknowledged that insurance and maintenance were issues that Wilkie and the Club still needed to address. Shearer doesn't explain his basis for assuming that the Club would cover cleanup and liability insurance costs.

---

[112]  Shearer Addendum, Doc. 92-4 at 7 (Irem Club Ltr.).
[113]  *Id.*
[114]  *Id.*

As for other costs, Shearer explained that "[e]xpenses would include electric and some cleanup."[115] He estimated—without any discernable basis—that: finishing the restoration of the barn for events would cost "approximately $50,000," each event would incur $200 in cleanup fees and $100 dollars in electricity costs, and fire and casualty insurance would cost $2,500 for the year.[116] Shearer also appears to implicitly assume that Wilkie could have obtained the necessary permits at no cost.

Using the figures above, Shearer calculated the barn's income after expenses to be $30,500 in its first year, and applied a "reasonable capitalization rate of [eight percent]."[117] He does not explain why eight percent is a reasonable rate. Subtracting the $50,000 in estimated restoration costs, he calculated the present value of the barn to be $330,000.[118] Shearer doesn't explain why he's qualified to make any of above assumptions or what his factual basis for those assumptions is. It doesn't appear that he spoke to the Club's director about the feasibility and costs of running an event-venue business.[119] As noted above, he's not in the event planning or venue business, and if he obtained quotes for his cost estimates, he didn't provide them

---

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] Wilkie "anticipates calling the event coordinator to testify regarding the proposal made" but offers no representation as to what the coordinator will testify to. Barn Value MIL Opp., Doc. 92 at 17. But as far as the Court can tell, Shearer did not speak to the Club's director, and therefore cannot rely on the director's testimony to form his opinion.

with his report. Therefore, even if the income capitalization approach were appropriate here (which appears unlikely), Shearer's application of it is unreliable and inadmissible. Accordingly, Shearer may not opine on the hypothetical event-venue business Wilkie proposed to start in his barn.[120]

### G.    Excluding Shearer as an Expert

In its *Daubert* Motion, Transco moves to exclude Shearer's testimony in its entirety. Transco's motion relies in part on the arguments raised in its other motions regarding the speculative development of residential lots, the hypothetical event venue business in the barn, and the subjective analysis of the lost trees' value.[121] The Court has already addressed those issues as well as the *Daubert* standard.

The only new grounds for exclusion Transco raises is Shearer's reduction of the Property's value for its proximity to the pipeline as a result of the taking. To compensate for that proximity, Shearer assigned a five percent reduction of the Property's before-taking value.[122] Transco argues that the pipeline-proximity aspect

---

[120]  Like the Court's ruling on Transco's Speculative Development Motion, this ruling does not prohibit Wilkie from presenting additional evidence of the proposed event-venue in the barn, subject to any objections from Transco.

[121]  Shearer *Daubert* Mot. Br., Doc. 89 at 1-2.

[122]  Shearer Report, Doc. 88-2 at 86.

of Shearer's opinion should be excluded because it's unreliable and accordingly inadmissible under Rule 702 and *Daubert*.[123]

Shearer states that Wilkie's residence on the Property is "within the recognized Potential Impact Radius ('PIR') or Blast Radius (hazard and impact zone) of a high-pressure natural gas pipeline."[124] Those radii are calculated by "comparing the diameter of a natural gas pipeline to its maximum operating pressure (psi)."[125] But Shearer notes that he does not know how far below the ground the pipeline sits—which appears to be key fact for determining whether Wilkie's residence falls within the radii.[126] Shearer explained at his deposition that "there is some actual risk and perceived risk when you are within the consequence area of a pipe line" but then admitted that Wilkie's residence is close to, but not within, the consequence area.[127]

---

[123] Shearer *Daubert* Mot. Br., Doc. 89 at 3-4. Transco also notes that it appears that Shearer moved numbers around to arrive at a measure of damages similar to his original report despite intervening changes in the law. *See id.*

[124] Shearer Report, Doc. 88-2 at 67.

[125] *Id.* at 67-69 (citing Mark Stephens et al, A Model for Sizing High Consequence Areas Associated With Natural Gas Pipelines, ASME INTERNATIONAL PIPELINE CONFERENCE (2002)).

[126] *Id.* at 67. Shearer explains that structures and people are in danger when they are in a "High Consequence Area ('HCA')," which is anywhere between 300 and 1000 feet away from the "center line of the pipeline" depending on its pressure and diameter. *Id.* at 72. That distance presumably includes the underground depth of the pipeline, a distance that Shearer did not factor into his analysis because he did not know it.

[127] Shearer Dep., Doc. 69-6 at 123:21-125:1.

Shearer instead applied a reduction in value due to the "stigma" of being close to the pipeline. He refers to various studies that he considered but ultimately admits that the five-percent reduction is "totally subjective."[128] He opined that one "ha[s] to allow something for it. I allowed [five percent]. Now, can it be proven? Yes and no."[129] He later again equivocated on whether he could demonstrate a reduction in value for proximity to a pipeline using paired sales, commenting that there are indications that houses near pipelines sold for less and for more.[130] Shearer cites several cases in which courts have adopted a "stigma" theory to severance damages.[131] But Shearer cannot merely point to other cases approving the concept of stigma damages. He must apply a reliable methodology to determine the effect of stigma damages in this case and he admits that he cannot. Accordingly, the Court will not permit him to testify as to the reduction in value of Wilkie's property due to the stigma of being near a pipeline. However, the Court sees no basis to exclude Shearer from testifying to the other aspects of his opinion. But Transco may of course raise additional objections to his testimony at trial.

## IV.   CONCLUSION

---

[128]   *Id.* at 125:5-126:5.

[129]   *Id.* at 128:10-81.

[130]   *Id.* at 131:5-23.

[131]   Shearer Report, Doc. 88-2 at 76-77 (citing *inter alia United States v. 14.38 Acres of Land*, 80 F.3d, 1074 (5th Cir. 1996)).

For the foregoing reasons, the Court grants Transco's Speculative Development, Barn Value, and *Daubert* Motions in part and grants its Noncompensable Damages and Professional Fees Motions in full.

An appropriate Order follows.


BY THE COURT:


<u>s/ Matthew W. Brann</u>
Matthew W. Brann
Chief United States District Judge